2019 5-0-2-2-0. Rodriguez Solorzano v. Nielson, et al. Good morning, your honors, and may it please the court. Counsel. Angel Martinez on behalf of the United States government. Temporary protected status or immigration benefit that temporarily freezes removal, any removal proceedings for its beneficiaries and allows them to work in the United States pending dangerous conditions in their home countries. But as this court has recognized, it is not a card to blanch free pass for adjustment of status to lawful permanent residence. The district court in this case held that TPS inherently includes an inspection and admission and cures all deficiencies for adjustment of status, even for people who enter the United States unlawfully without an inspection and admission. But that finding is inconsistent with the plain text of the statute, and this court should reverse it. Counsel, before we talk about the plain text of the statute, do we have jurisdiction? Do we have a case where we found a denial of a motion to dismiss with the remand to an agency to constitute a final decision such that we have jurisdiction? Your honor, I appreciate your briefing, but the basis for this court's jurisdiction under section 1291 is because the district court's denial ended the litigation on the merits. Now, I don't know that there's a particular district court in the western district of Texas that did the same thing, but the district court relied in the D.C. circuit, and in the D.C. circuit, when a district court ends the litigation on the merits, there's nothing else to do but to execute the judgment. The circuit court adopts jurisdiction. So you're saying the D.C. circuit is so held, we have not addressed the issue. Is that what you're saying? I believe that you have not addressed the issue directly, but I'm not sure, your honor. I would have to rely on the briefing that we provided to the court, but with the court's indulgence, I can refer to it. Well, you believe that that's the D.C. circuit's position, and that's the basis. What's the logic of it? The logic of it is that there's nothing else to do in the district court, nothing that would change the district court's judgment, such that the only avenue for the government to change it would be to appeal to the district court. And that is even the case with, this is particularly the case in what the district court did, because not only did it issue an order on the motion to dismiss that ended the litigation, but it also ended a judgment date in its docket. So it effectively closed the case, and there's nothing else to do but to appeal if the government wanted to challenge that decision. Okay, thank you. Thank you, your honor. To assist the court with the analysis of the issue at hand, I'd like to provide a very brief contextual background on TPS and the purpose of the provision at hand. The genesis of TPS stems from Congress's intention to assist Chinese students to be able to remain in the United States pending the dangerous conditions in China in 1989 during the Tiananmen protests. The provision at issue here is section 1254 AF4, which says that for the purpose of adjustment of status, a TPS beneficiary shall be considered to be in and maintain lawful status as a non-immigrant. What that does is it bridges the gap for people that might lose status absent TPS and are, would be unable to adjust status. For example, a student visa holder might enter the United States, or a tourist visa holder, or anybody under a specialty occupation enters the United States with a proper inspection and admission. While they are in the United States with proper lawful status and have been inspected, something happens in their home country that it would be dangerous to require them to go back if that status expires. TPS bridges the gap and allows them to continue to be considered in lawful status such that if they qualify, they will be eligible to adjust status. It's a bridging in the gap provision. Can I ask a question about that please? Yes. I understand that there's a, that Solarzano argues that 1254A waives the inspected and admitted or paroled requirement of 1255A, while the amici argue that 1254A constitutes an admission for the purpose of 1255A. There's a slight difference in the way that they analyze the question. Do you believe there's an analytical difference between the two approaches of the amici and the plaintiff? There is a difference, Your Honor, and that difference is noted in the district court's opinion, because the district court's opinions reached its decision on several bases. One, on the basis that Mr. Solarzano sets forth that section 1254AF4 cures the deficiencies for adjustment of status. Another basis is that the district court found that TPS beneficiaries are non-immigrants, and because of that non-immigrants, it computed its error by assigning an admission. Those are different analysis and I would address them separately. I would also note that nothing in the TPS statute reflects that it is an absolution for prior disqualifying acts, and it is particularly telling that when Congress intends for people who enter the United States without an inspection and admission to be able to become lawful permanent residents, it does so explicitly. For example, for U visas of cooperating with the prosecution of crimes, they can adjust status without having been inspected and admitted or paroled. Similarly, T visa beneficiaries, victims of trafficking, special immigrant juveniles are deemed paroled under the statute and are able to obtain permanent residence despite having entered the United States unlawfully. For purposes of lawful status but not admitted, you give examples of parole in place and asylum recipients, but do those people have lawful status as non-immigrants, and does it matter? Because, you know, this, the lawful, as non-immigrants is a particular, is the language of the text. Certainly, Your Honor. Well, and I'll begin by addressing the reason that Your Honor mentioned earlier, the analysis of whether 1255, the TPS statute cures the deficiencies in 1255, because it is important to make a distinction that lawful, you can be in lawful status and not have been admitted, or you can be admitted and later on lose lawful status. That means that the TPS statute, while it covers and refers to Section 1255, it addresses, it provides a benefit for a specific portion of 1255, which is the bar to adjustment for failing to be in lawful status at the time you submit an application and having failed to be in lawful status but not admitted as a non-immigrant. You can be in lawful status and not have been admitted, Your Honor, and that's wonderful. As a non-immigrant, but be a non-immigrant. I think that there's two fallacies in the amicus's argument here. You can be a non-immigrant and not have been admitted. For example, what's an example of that? Sure, so you visa beneficiaries, they are non-immigrants and they are able to have been admitted. T visa beneficiaries are in the same situation, victims of trafficking. In addition, the fallacy in amicus's argument is that because TPS refers to the term non-immigrant, they accept that TPS beneficiaries are not actually non-immigrants, but they say that Congress created a legal fiction that imputes an admission for the purpose of adjusting status. But the main fallacy in that argument is that you can be a non-immigrant and not have been inspected and admitted, and you can be in lawful status and not have been admitted. So the examples that we provided in the briefing, parole in place for members of our military, people that are asylees in this country, they are in lawful status and haven't been admitted, especially immigrant juveniles. They're not non-immigrants. Pardon me? They're not non-immigrants. They're not non-immigrants, but that is an example of how Section 1250, the TPS statute, does not address both of the requirements to adjust status, which is to be and maintain lawful status and also to have been inspected and admitted or parole. What the TPS statute does is it mirrors those requirements, the bar for not being in lawful status. Why? Because it does so almost exactly the same. It says that you have to be in lawful status to get your application, and that you must also not have failed to attain lawful status. So just can you give an overview? You would like us to hold today that the plain text would require reversal of the district court? Yes, Your Honor, because the district court error, based on the plain text, because the TPS statute does not cover those two requirements at issue here, inspection and admission or parole, and not having failed to maintain lawful status. It's also contrary to this court's prior rejection that TPS cures all deficiencies for the purpose of adjustment of status. In the Guerrero case from 2018, this court held that TPS is not a carte blanche for adjustment of status because TPS did not apply to the accruement bar for admission in section 1255C1. So if Amicus and Mr. Solorzano's argument were correct, then this court would have found that the TPS statute would cover all prior disqualifying acts, notwithstanding the fact that the plaintiff in the Guerrero case entered the United States at accruement. That's not something that this court did. And the court emphasized that principle recently last year in the Melendez case when it held that TPS does not absolve from prior unlawful conduct by holding that TPS did not cure prior periods of unlawful status. So in principle, this court has held that TPS is not an absolution for prior problems and deficiencies. It would be inconsistent with the reasoning of those cases, is what you're arguing. Yes. We have not addressed the issue. Our sister circuits have. There's already a split. So whichever we go, we're not creating a split. Is that correct? That is correct, Your Honor. This court has not addressed the issue explicitly, but it has dealt with situations that are very similar, and the time has come where this court is facing the issue directly in this case. You know, our sister circuits have found contrary holdings, and they've said it's not ambiguous, but they've gone the opposite way. Now, it doesn't necessarily mean that something's ambiguity issue, whether it could be ambiguous, and if it was, then do you believe that you still prevail? Sure, Your Honor. Well, we believe that the court does not need to reach an ambiguity determination to rule in the government's favor, and we also believe that the circuit courts have compounded each other's error. Now, the Serrano court from the 11th Circuit found in the government's favor of its interpretation, and two other circuit courts, the 9th Circuit and the 6th Circuit, have not. The district court's decisions that have followed have just compounded the error one over the other. If the court were to reach a decision that the language is ambiguous, it should still defer to the agency's interpretation, because the most recent agency interpretation, it is binding on DHS and immigration judges, and so therefore we believe that it is a correct interpretation and deserving of Chevron deference. Even if the court would think that it would not deserve Chevron deference, it would still be deserving of Skidmore deference, because it has a power to persuade. It is well-reasoned. In fact, it is consistent throughout different administrations and consistent since the inception of TPS. The agency has interpreted TPS like this since 1990, when an opinion from the general counsel at the former INS held that, or reasoned that, TPS is simply not an inspection and admission to allow people to adjust status. It is not a pathway to lawful permanent status. How do you respond to Amiki's point that a TPS holder who entered without inspection could just travel out of the country and get admitted on their way back? Well, that is the argument that it would be absurd to require people to go back to their countries, that they were designated dangerous in the first place. They don't even have to go back to their countries, do they? Correct, Your Honor. They can just go a few-hour drive and come back in, and then they would be okay? That is correct, Your Honor. They don't have to go to their original countries that were originally designated dangerous. They can go to any country of their choosing. And I would like to note that this happens all the time. It is not uncommon for somebody to obtain an immigration benefit to have to leave the United States and be processed through consular processing in order to obtain that immigration benefit. For example, people barred under several of the conditions in the adjustment status must have to do it from outside unless they obtain a waiver. Certain student visa holders must have to do it from outside as well. In fact, even people that marry U.S. citizens during removal proceedings must have to leave the country to come back to the United States with some exceptions there, such as if they can prove that the marriage is bona fide. This just shows that this happens all the time and it's not uncommon. Is it possible for someone to do that, to have been not properly admitted, come in, TPS invokes, they leave, and then they're not allowed back in? Could that happen? It could be a situation, Your Honor. That's not an issue that has happened in this case, but there is a procedure to make sure that there is less uncertainty with that because people in Mr. Solos and her situation can start the consular processing from within the United States. They can do the preparatory work here. I'm saying is it a mere three hours down the road and back, or is there something to this processing someone who comes in? Well, they will be subject to the inadmissibility grounds. They will be subject to all of the inadmissibility grounds, so there is a possibility that they might not be eligible, but this is no different than anybody else that comes into the country without an inspection and admission. But there is a reason that Mr. Solorzano, Mr. Rodriguez Solorzano is not eligible, right? He might be eligible. He can start the process here. In fact, he can submit a waiver from within the United States and have a better indication of whether it will be eligible. But to know, I mean, he's lived here in the United States for a long time with his family, with no criminal history, et cetera, right? Yes, Your Honor. My time is up, but if I may answer the question. Yes, please. Yes, so he has been living here for a long period of time, but he has an avenue to adjust status, and it's an avenue that has even put him in a better position than other people that have similar equities that enter the country without inspection and admission and parole. I have one more question. If someone was a TPS person, but they went out of the country and then they've already gone and come back, are they now, they've been admitted and so they're not in this group of people anymore because they have been admitted? I mean, you could have been admitted if you, that assumes that you come to the country one and only one time, but we're just talking about people coming and going. So some people with TPS have already been formally admitted because they've gone in the meantime, right? Yes, so they would satisfy, presumably, the inspection and admission or parole. They would still need to satisfy all of the other requirements under the adjustment status. One of the common problems, and this came up in the Melendez case, is that most of these beneficiaries have accrued periods of unlawful status that prevent them from adjust status, but that's not the case in Mr. Solorzano's situation because he is not subject to that bar as he is seeking to adjust status as an immediate relative to a U.S. citizen. So that bar doesn't apply to him. But to continue answering your Honor's question on this topic, people that come back into the country must apply and undergo all of the, they are subject to all of the inadmissibility determinations at the port of entry, but that's not something that happens with TPS. So to obtain TPS from within the United States, you are not subject to all of the inadmissibility grounds that you would be subject if you were applying for an inspection and admission at a port of entry. For example, aliens previously removed, and this is a term that the immigration law uses to refer to non-citizens or nationals. They would be able to apply for TPS and obtain it, but somebody at the port of entry would not be able to come in. People that are unlawful . . . Your time has expired now, and you've saved time for rebuttal, and you can elaborate on this further if you choose in your rebuttal time.  Good morning. Good morning. May it please the court, counsel. My name is Jim Morales, and I represent the appellee Luis Orlando Rodriguez-Solorzano, who is present with us in the court today. Presenting with me today is Mary Kenny, counsel of the amici. I will cover the background facts, and Ms. Kenny will cover the statutory interpretation issues. The appellee Luis Orlando Rodriguez-Solorzano was born in Honduras and is 68 years old, and he has lived legally in the United States for over 20 years. He entered the United States without inspection in 1997. Due to Hurricane Mitch, the country of Honduras was designated as for temporary protected status in January of 1999, and by June of that same year, the appellee had applied for TPS. He has remained in TPS status ever since, going through all the renewals, updating all his Mr. Rodriguez married his U.S. citizen wife in December of 2009, and in July of 2014, his wife filed a visa petition on his behalf with USCIS. At the same time, he filed his application to adjust status again with USCIS. As an adjustment status candidate, Mr. Rodriguez-Solorzano is classified as an immediate relative. That's important. In 2018, USCIS denied his application. It found he was not eligible for adjustment because he had not been inspected and admitted as required by 8 U.S.C. 1255A. But in denying this application, USCIS rejected the argument of the Sixth Circuit in Flores. That holding was correct in that under the plain language of the TPS statute found in 8 U.S.C. 1254A.F.4, he is deemed to have been admitted and inspected. Ms. Kinney will go further into this argument. Again, Mr. Rodriguez-Solorzano is present and he seeks this permanent residence so he may remain in the U.S. legally with his U.S. citizen wife where he's been for the last 20 years. But the TPS would still be in place, right, if he did not get this? If he does not get this, at the current time, TPS is still in place. It is a discretionary benefit that can be removed depending on it. But he's been here on that benefit for a very long time, and so it's not Right, which begs the question, what's the definition of temporary? Right, well, I mean, you could say that it was meant to be temporary, and it's really once you come, you stay on TPS. Other long-term TPS statuses have been revoked in the past year or two, right? Yes, and as a matter of fact, TPS is a temporary status, 20 years. Permanent residence status is permanent, and those can be revoked, too, for various No, I'm not talking about on the individual. I'm talking about The countries The countries that have been subject to TPS, and then that has been removed in the last year or two. Yes, it's a fluid Honduras, we don't know about. Currently, that has not happened with Honduras. There have been several times throughout its history that it has been announced that it was ending. There has been a recent time when it said it was ending. Then it was extended again, and there's some other litigation that has got to stay in place for agency action. Opposing counsel says there are other avenues. Can you discuss that? An individual who did not go through a port of entry, and may have accrued unlawful presence, if they marry a U.S. citizen, they can adjust status inside the United States. If they did not go through a port of entry, they can do the initial part of the processing in the United States, but must complete it through consular processing in their home country. It just has to be in the home country. It can't just be go across the bridge to Mexico. I live in Houston, so I'm thinking Theoretically, any consulate could do it, but as a practical matter in working parlance, they all have to go back to their country of origin. Well, you said practical matter. This really is a key part of, I think, your opposing counsel's You're sort of suggesting they have to in real terms, and certainly the impression given by the argument on the other side is it doesn't really work that way. What are you basing it on, that in practical terms it has to be back to Honduras as opposed to Canada or Mexico or someplace else? Well, if they have to go back to their country of origin, it kind of guts the whole humanitarian benefit. Well, no, I'm saying, what are you basing your point on that it needs in practical terms it has to in practical terms be in the home country? And you've heard the argument on the other side, and he's saying it doesn't have to be in the home country. So what are you basing your argument on? Your Honor, I've never had I practice immigration law extensively, and we've never been able to get an adjustment through consular processing anywhere else other than the applicant's home country. When I say in theory it could be done, there's a lot of things that happen in immigration law if you push hard enough and if Is it an unwillingness by the foreign country? Somehow you get permission to go somewhere else. Is it an unwillingness, or what is the barrier? The barrier is there's no avenue for it. I'm sorry, what? The barrier is there's no avenue other than going through consular processing in your home country. Okay, okay. Are there random exceptions? Yes, but those are super secret and nobody talks about them. Do you have anything else that you would like to, because I understand that I shouldn't ask you my questions about the, I think your co-counsel or a meeting council, so do you have anything else you'd like to present? If the panel has no further questions for me, I am finished and I will cede the balance of my time to Ms. Kenney. Thank you, Counselor. May it please the Court, Mary Kenney on behalf of AMICI. I want to start by addressing the two most recent questions and just clarifying a little bit. Judge Haynes, your question about whether or not the TPS for Honduras has been terminated, it was terminated by this administration. There were several lawsuits and currently there is an injunction. Yes. I thought so. Yes. I thought I was right on that. So for as long as that injunction remains in place, that case . . . That's judicial. If that goes away, then . . . It will be over. . . the resident has said temporary has been long enough. Yes. Right. Then it would end. That could go away. Yes. But there's no indication that everybody on TPS is going to be rounded up or anything. There's no . . . even if they're not in status at that point. I don't know that there was a plan or something that's been announced. Well, what I understand is that Immigration and Customs Enforcement, ICE has made, has indicated that it would, if people lose their TPS status, that it would begin to place those individuals into removal proceedings. Okay. But the priority remains the people in criminal . . . Not currently. They're no longer those priorities. So currently, anybody who's not in . . . Well, if they happen to be with them, but they're not going out to find people who are . . . But that's not the priority. It could. They could make that a priority, yes. They could. That is a possibility, yes. It's not currently. I think people would be at great risk at that point. Okay. Judge Southwith, your question regarding consular processing, I think the barrier is the fact that the individual would need permission from that third country to be able to consular process and, in many cases, would need to have a visa from that country in order to do so. I don't have any site for you. I'd be happy to supply it for you afterwards if you would like it. But it's that permission that they need from the country that makes it difficult because in most cases, it's very difficult, and a third country is not willing to just give permission for an individual to consular process through their country. Well, I appreciate that reaction. I sort of lay it with the opposing counsel to address that when he gets back up here because it was a significant part of the argument. But regardless of this feature, regardless of whether TPS is ending for Honduras or not, that doesn't affect, it seems to me, the interpretation of these provisions we're talking about. Unfortunately, it has a potential effect on the client here. But insofar as what these rules mean, temporary protective status is supposed to be temporary, and how does this all fit together? So proceed. Thank you. I agree with you. It doesn't change the statutory interpretation at all. And our argument is that Congress chose the language very specifically. It specifically said that an individual is, while in TPS status and for the purpose of adjustment of status, so for a very limited purpose, the individual is to be considered as being in and maintaining. So those are two distinct words that need to be given different meanings and that have different meanings as a lawful nonimmigrant. And, again, that's very distinct. And both the Ninth Circuit held in Ramirez and the Sixth Circuit held in Flores v. USCIS was that by using the word considering, the statute deems the individual to be in and maintaining lawful status as a nonimmigrant. And in order to be in lawful nonimmigrant status, the individual must have been inspected and admitted, because with a few exceptions, which I'll talk about in a minute, that government counsel raised, all nonimmigrants are inspected and admitted. And as Judge Higginbotham indicated in the Guerrero case, he indicated that the analysis in Ramirez really closed the gap between the terms inspected and admitted in the adjustment statute and the lawful nonimmigrant status in the TPS statute. Okay. I have a bunch of questions. Okay. Do you think it matters whether we consider 1254A to waive or whether reanalyzing it is constituting an admission? Do you think it matters? Yes. I think it doesn't waive it. It is an admission. It is deemed to be in lawful nonimmigrant status. Like Flores Sixth Circuit. And therefore deemed to have been. Deemed. It's not a waiver of it. It's deemed. It satisfies it. That's right. What do you do about the members of the armed forces and the asylum recipients that we were discussing earlier? They are in lawful status even though they're not inspected and admitted. I think your question was right on point, Judge Alrod. The difference is they're not nonimmigrants. And so, therefore, by specifying that these individuals are considered to be in lawful nonimmigrant status, Congress was really pointing very specifically to the situation of nonimmigrants. And what I'd like to say to counsel for the government did not quite capture our argument. We are not saying that this provision provides all TPS holders with an automatic right to lawful permanent residence. What we're saying is that those individuals, by being deemed nonimmigrants, are placed in the shoes of a nonimmigrant. If a nonimmigrant were eligible to adjust, the TPS holder would be. But not all nonimmigrants are eligible to adjust. And this is why there's really no conflict between our interpretation and this Court's decisions in both Melendez and in Guerrero. In Melendez, there are other statutory requirements for adjustment. So although the deeming provision makes the TPS holder eligible under 1255A, the threshold requirement of inspection and admission, it doesn't mean that that individual necessarily is going to be eligible under the other requirements for adjustment or under the bars to adjustment because not all nonimmigrants are eligible. So they're placed in the shoes of a nonimmigrant. The nonimmigrant in Melendez, for example, was not eligible because his period of unlawful presence was counted against him. And there's a bar to adjustment where there's any period of unlawful presence subsequent to entry. That bar does not apply to Mr. Solazano because he is an immediate relative, and immediate relatives are specifically exempted from that bar. Guerrero is another example. In that situation, the individual was a crewman. And so nonimmigrant crewmen are barred for—are just generally barred. There's a bar against adjustment for individuals who—for noncitizens who arrive as crewmen and are admitted as crewmen. And so that is an important distinction. This is not an automatic path. It's not a carte blanche for adjusting every TPS holder. That TPS holder still has to demonstrate that even as a nonimmigrant, he or she would be eligible to adjust status. What do you do with the fact that the language in Guerrero and Melendez is—doesn't seem like that it's favorable to this reading? I don't think it's unfavorable, Your Honor. I actually think it didn't address this issue, so it didn't need to dig into the term consider. And in the same way, it didn't need to look at what does it mean to be in lawful nonimmigrant status. It concerned the bars under 1255C2. It did not concern whether or not being in lawful nonimmigrant status, because there's a prerequisite for being in that status, the individual has to have been inspected and admitted. Can you help—what if one were to look at 1255A and say it applies—it doesn't—it applies only to an alien who was inspected and admitted or paroled, and then say, well, 1254AF4 doesn't—isn't relevant because 1255A is not satisfied in the first place? What do you say to someone who would make that argument? I'm not sure I follow the argument. Could you state it again? Well, I guess the idea that because the predicate is not satisfied for the 1255A, we don't even get to whether or not it's some kind of alternate admitted or paroled. My response would be the deeming. The fact that an individual is deemed to be in—two responses. One is the use of the word considered as a deeming provision, and two, the distinction between being in and maintaining lawful nonimmigrant status. To be in lawful nonimmigrant status, an individual has to have been inspected and admitted, and that's the—in Guerrero, the note that the Court made with respect to the analysis of remittance. That's a pretty big deal to do by this kind of sub salientio reading. I mean, shouldn't they have just said she'll be considered as having been admitted in lawful status rather than being in? Well, I think what Congress was trying to do was really achieve several things through this provision, and it did achieve several things. And had it just said that, it would not have achieved the other purposes. Those purposes included both dealing with individuals who were not in nonimmigrant status by placing them in—deeming them to be in nonimmigrant status. Those individuals who were at risk of losing were in nonimmigrant status but were at risk of losing and therefore not maintaining by maintaining. And then third, dealing both with adjustment of status and change of status within the same provision. So by doing it this way, the Congress really achieved multiple objectives that the— And if they wanted those people to be eligible for adjustment, it would seem like they'd be a little more clear on that. Rather than this kind of round way where we're driving in a circle to get to this point, it just would have done it directly. They know how to do that. Well, I—honestly, I do believe that they did it fairly directly, but because they deemed them, if they had said it some other way, then maybe that— Because it's being in, not having been in, not having been admitted. So—and I think that sort of goes to another point. The government would restrict this provision to—and I'm sorry, I'm out of time. You may answer. The government would restrict this provision to only individuals who are in nonimmigrant status and at the time they receive TPS and then at risk of losing it. That doesn't deal with the difference between in and maintaining. If they're already in nonimmigrant status, then Congress would not have needed to say in and could have dealt with them simply by saying maintaining. It also conflicts with the structure of 1254-F, as this court recognized in Melendez and cited it, that 1254-A-F states that during a period in which an alien is in TPS, that alien—it then has four subparts, and each subpart then says that alien, two of those subparts provide a benefit. That alien shall be eligible for travel, for instance, and then two of them have restrictions on what the TPS status grants. For instance, that alien is not eligible for—or the alien, it says, the alien is not eligible for public benefits. The government would read the first three of those four subparts as applying to—and we agree, those first three apply to all TPS holders. But the fourth provision, it would limit, despite the same language of during a period in which an individual is in TPS status, or which an alien is in TPS status, the alien shall be considered in and admitted as a lawful nonimmigrant—in and maintaining, I'm sorry, as a lawful nonimmigrant. They would limit that to a subset of all TPS. And so they would treat that fourth one differently. Last question, can you address if it's ambiguous, do you lose? I don't think we do, Your Honor, because I don't think that the government, for a number of reasons, including the most recent one of just explaining that the argument— Because of that reason, you think it's an inconsistent interpretation of the text. It's not a rational—it's not a reasonable interpretation, and it doesn't make sense of all of the words. Thank you. Thank you. Your Honors, I'd like to briefly clarify some points. First, it is incorrect that people in Mr. Solorzano's situation must have to go back to their country of origin. They can choose any country of their—that they want to go to for consular processing, and this happens all the time, based on typically where people can get the first interview, where it's cheaper to travel to, cheapest, and when they're able to do it. For example, Brazilian nationals travel to Mexico all the time to obtain immigration benefits. They go to Reynosa. But he's also saying that they've been in immigration for years, and they can't ever get the appointments and things, and they won't work with them. I'm not sure that that's correct, Your Honor, because they're situated differently from people that are in this country without inspection and admission that just a mere application would trigger removal proceedings. It wouldn't in their situation because they have the TPS protection. They can start the consular processing from the United States, and they can choose whatever country they are able to go to, and it will be cheapest for them. It happens all the time with people of different nationalities going to Reynosa, going to Tijuana, going to Mexico City. Counsel, it sounds like both of you are talking about something that's not in the record. Does it really work this way or not, practically speaking? Is that a fair assessment? We don't know that people do this all the time, though I trust that you believe they do. I'm not suggesting anything other than candor from you, but there's nothing in the record on that and nothing in the record to indicate the difficulties. So maybe we just need to move on from that. That is correct, Your Honor. It's not in the record, but ultimately it's not an issue that the court needs to decide to determine this appeal. Let's just assume arguendo that he'd rather not have to leave to come back. And so if there's some other way to get there, then that's what he's arguing for. Respond to this being in and maintaining concept as the core here that that shows that Congress intended to sort of deem them having been inspected. No, Your Honor, because the requirement for admission and the bar for failing to be in lawful status are different concepts, and TPS only talks about lawful admission. And this court has already recognized that lawful status and admission are different concepts in the Gomez case, compounding both. Excuse me? The Gomez case was a case about – You said TPS only talks about lawful admission. Correct, Your Honor. So it does not talk about whether a person with TPS satisfies the admission requirement. It doesn't talk about lawful admission. It does talk about lawful status. Correct, Your Honor. And Judge Elrod also asked whether it matters whether the court analyzed this issue as a waiver of the bars to adjustment of status or whether TPS satisfies the admission requirement. It doesn't matter because TPS is not an admission because an application for TPS is significantly more lenient than an application for an admission at a port of entry. There are many things that the government does not consider to grant somebody TPS that would have to consider for somebody trying to enter the United States. For example, being a public charge, somebody that is a public charge can obtain TPS, but they cannot enter the United States. Another example I'd like to give is stowaways. Somebody that comes into the United States as a stowaway is completely ineligible to adjust status, but they might be able to get TPS and be protected from having to be removed to their country of origin. So to conflate both and consider one, TPS, to be the functional equivalence of the other would create a loophole, an immigration hole, by which people that are otherwise ineligible for an immigration benefit are able to obtain it with less vetting, less significant vetting. And finally, Mr. Solorzano made the point, and this Court asked that if TPS goes away, would they be rounded up for removal? Well, the TPS statute is a temporary statute, and its beneficiaries are on notice that it is a temporary benefit because the text – They're supposed to leave once the temporary ends. Correct, Your Honor, and it's not like it would come out of the blue that all of a sudden they are subject to removal. They are on notice for it, and if they had been here for 20 years, they are on notice that this could happen. The explicit text of the statute says that a TPS beneficiary shall not be – If the judicial stay goes away, it does happen with Honduras, right? Excuse me? If the judicial stay goes away, it does happen with Honduras. This isn't an imagined concept. You're correct. The President has said this about Honduras. It's about Honduras. And it's pending right now in a court somewhere, but if that stay goes away, then Mr. Solorzano is subject to being removed immediately. Not necessarily, Your Honor, because the government might – the removal of TPS designation is not something that the government has finalized. But in any case, TPS beneficiaries are on notice and it's based on the text of the statute that says that TPS beneficiaries are not to be considered to be living in the United States permanently under color of law. What's wrong with my question? If the President's announcement is no longer barred by a judge, I realize I may have to fill out some forms, but Mr. Solorzano could be removed or asked to leave, maybe more politely, but nonetheless has to leave the United States. That is the point you were making. It's temporary and it's time to go. That's what you're arguing. Ultimately, yes, Your Honor. He might have to leave the United States, but there will be a process for it. He must go remove a proceedings in front of an immigration judge in which he can – I'm very aware, sir. I've been on this court 12 years. We have a ton of these appeals. I understand the removal process. It's not that they pick him up and throw him out the door, but nonetheless, he's going through a removal. And the ultimate goal of which is to remove him. Yes, Your Honor. Okay. I mean, that's the point here. That's why he's trying to stay and trying to adjust his status so he's not subject to removal. Which is a good idea to start doing the consular processing before that removal process begins, Your Honor, and he's able to do it from the United States. I believe my time is up, but I thank the court. Can I ask Ramirez v. Brown, please? They said the text says lawful status as a nonimmigrant. They say the heading of the statute says adjustment of status of a nonimmigrant to that of a person admitted. And then they look at purpose, but we're not going to look at purpose today. Why aren't those first two reasons reasons that run counter to your argument today that the Ninth Circuit has already determined? If I understand correctly, Your Honor is asking why if the TPS statute refers to the adjustment status entirely, it doesn't cover an admission? I'm asking why Ramirez is wrong. Serrano has very little analysis, but Ramirez has a lot of analysis. Why is Ramirez wrong for its first two reasons? Well, Ramirez is wrong because it's equated nonimmigrant status with inherently included an inspection and admission. But that is simply wrong because you can be a nonimmigrant status and not have been inspected and admitted, such as U visa beneficiaries or T visa beneficiaries. Another reason why I think it's the Rodriguez case you're referring to, Your Honor, or the— Ramirez, never mind. Thank you. Thank you, counsel. I think we have your argument. Okay. Thank you, Your Honor. This case is submitted. We appreciate the helpful arguments of counsel today.